# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| CHRISTA CLARKE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 09-CV-6-PJC |
| | ) |
| MICHAEL J. ASTRUE, Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Claimant, Christa Clarke ("Clarke"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Clarke's application for disability benefits under the Social Security Act. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Clarke appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Clarke was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

Clarke was 40 years old on her asserted date of disability, April 1, 2004. (R. 14, 20). At the hearing before the ALJ on May 2, 2008, Clarke testified that she had been diagnosed with diabetes which affected her ability to work by making it painful to sit. (R. 366). She had pain running down her thighs, and she also had pain in her arms. (R. 366-67). She estimated that she

1

could sit for about 20 minutes, and then the pain would feel as if the circulation to her legs was cut off. (R. 367). She described the pain in her arms as throbbing, and she complained of numbness. *Id.* She also complained of shoulder pain, and her understanding was that all of the pain was a result of her diabetes. (R. 367-68). Clarke testified that her diabetes medications worked, but she could not afford them all the time. (R. 368). She still had neuropathy even if she took the medications. *Id.* At the time of the hearing, Clarke had recently started a new treatment based on electrical stimulation that she had seen advertised. (R. 368-69). She testified that this new treatment helped, but the pain returned after about 24 hours. *Id.* She received the treatment three times a week. *Id.*

She testified that she also had problems with her balance, affecting her ability to stand. (R. 370). She could stand for only 10 to 15 minutes before the pain in her knees, ankles, and sides would become unbearable. *Id.* She testified that she could not walk a city block, and she didn't know if the difficulty with walking was related to her weight. *Id.* One of her doctors had checked a form stating that she shouldn't lift over ten pounds, and he told her that it was due to the neuropathy in her hands. (R. 370-71). When she was on her medication, she would try to do chores such as doing the dishes and cooking. (R. 371). Her husband did most of the housework. (R. 371-72).

Clarke testified that in July 2007, she began receiving psychological treatment at Family and Children's Services. (R. 372-73). Dr. Cates was her psychiatrist, and he was treating her for depression and problems with concentration and memory. (R. 373). She had a fear of being around people, and she had disturbing thoughts, such as thoughts of harming her granddaughter. (R. 373-74). She had suicidal thoughts, and she once planned to drive off a bridge, but did not carry out her plan. (R. 374). Her husband reminded her to take her medications, because she

sometimes forgot. (R. 375). She testified that she loved to read, garden, walk, and crochet, but it was depressing because she could not do those things any more. (R. 375-76).

Clarke received medical treatment at Morton Comprehensive Health Services ("Morton") from 2002 through 2007. (R. 153-87). On August 13, 2003, Clarke presented with headaches, dizziness and fainting. (R. 184). The assessments included hypertension and a note to rule out non-insulin dependent diabetes mellitus. *Id.* She was seen on several occasions and on October 1, 2003 was diagnosed with diabetes. (R. 178-83). On January 20, 2004, Clarke presented with discomfort in her left leg, dizziness, blurred vision, and problems with her sense of balance, and there was a note that she had no medications since October 2003. (R. 173). Her diabetes was noted to be poorly controlled. (R. 174).

On August 2, 2004, Clarke had a follow-up appointment at Morton and a diabetic foot exam. (R. 170-72). On August 27, 2004, Clarke presented at Morton for a follow-up appointment, and she complained of headache. (R. 167). The diagnoses were uncontrolled diabetes and hypertension. *Id.* On December 27, 2004, Clarke again complained of headaches, along with fatigue and dizziness. (R. 165). The hand-written notes of this visit seem to indicate increased blurring of Clarke's vision as well as complaints of numbness and tingling in her hands. *Id.* The physical examination indicated that decreased sensation in her fingertips was demonstrated bilaterally. (R. 166). The diagnoses were uncontrolled diabetes and neuropathy, it appears that her medications were adjusted, and she was referred for an eye examination. *Id.*

On January 16, 2005, Clarke presented at Hillcrest Emergency Room with chest pain which was diagnosed as musculoskeletal chest pain. (R. 139-52).

On October 3, 2005, Clarke was again seen at Morton, at which time it was noted that she had not taken her blood pressure and diabetes medications for six months. (R. 160). The

3

diagnoses were uncontrolled diabetes, a history of hypertension, and musculoskeletal pain in her neck and back. (R. 161). Clarke was given a diabetic foot exam. (R. 162).

With some visits from October 2005 until August 2006, Clarke was seen at Morton on August 15, 2006, for follow up of her diabetes and a complaint of tightness in her chest as well as anxiety. (R. 157). She was noted as having a depressed mood with crying. (R. 158). The diagnoses were depression, anxiety, diabetes, hypertension, and insomnia, and five medications were prescribed. *Id.*

Clarke was hospitalized at Hillcrest in December 2006 for abdominal pain which was ultimately diagnosed as ileitis. (R. 309-19). During a consultative examination with Robert T. Wells, M.D. at the time of the hospitalization, Clarke reported numbness in her fingertips and toes, as well as pain in multiple joints, including her right knee, right shoulder and elbow. (R. 313). At a mental status examination during the hospitalization, Clarke admitted suicidal ideation, and auditory and visual hallucinations. (R. 316). The examining doctor, Roderick N. Purdie, M.D., diagnosed major depressive disorder, recurrent, severe with psychotic features, and he stated Clarke's current global assessment of functioning ("GAF") as 30, with her highest GAF in the past year as 60. (R. 317).

At an appointment at Morton on February 2, 2007, Clarke's hypertension was described as uncontrolled. (R. 154-55). On August 3, 2007, Clarke was seen for a check up at Morton, and it was noted that she had been out of her hypertension medications for one month due to financial reasons. (R. 259). On February 4, 2008, Clarke was seen at Morton with a complaint that she hadn't been sleeping for three or four days, as well as a complaint of numbness of both arms which she said had been ongoing since October. (R. 257).

Clarke went to New Tradition Clinic in April, 2008. (R. 303-06). Jeff David D.O.

4

prescribed electric stimulation for Clarke's legs three times a week for one month for leg pain. (R. 303). The technician noted that Clarke reported that she had neuropathy. (R. 305). Clarke described it as a "needles and pins" sensation in her legs and feet, and sometimes it would wake her up. *Id.* At a session on April 15, 2008, Clarke described her pain before the session as a "7" on a scale of 1-10, and afterwards, she described it as a "1." (R. 306). Clarke said that she felt like she had new legs, her feet felt wonderful, and her arms felt stronger. *Id.*

A document indicates that Clarke completed a request for services and some intake forms with Family and Children's Services on August 11, 2006. (R. 229-47). Clarke indicated that she was having thoughts of harming herself and was depressed. (R. 229). The diagnosis sheet showed Axis I[1] diagnoses as major depression disorder recurring with psychotic features, posttraumatic stress disorder, alcohol abuse, and cannabis abuse. (R. 239). Her GAF was reported as 44. (R. 241). Clarke was seen at Family and Children's Services for social work services on several occasions. (R. 274-79).

On February 26, 2007, Clarke was seen by Kristy Griffith, M.D. at Family and Children's Services for pharmacological management. (R. 280). Clarke reported that she was not doing well, and she was depressed and anxious in addition to not sleeping well. *Id.* Clarke was seen by her case manager on March 5, 2007 for assistance in completing Social Security disability paperwork. (R. 281). She was seen by Jeffrey Cates, D.O. on March 22, 2007 with complaints regarding mood, anxiety, concentration and motivation. (R. 282). When Clarke saw Dr. Cates again on May 30, 2007, she reported that she had not gotten her medications after the previous

---

[1]   The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000).

5

visit and had not been taking her medications. (R. 283). At an August 8, 2007 visit with Dr. Cates, Clarke said she was doing "ok" and was compliant with her medications. (R. 284). At visits on October 16 and 31, 2007, Dr. Cates again adjusted Clarke's medications. (R. 286, 289). On December 17, 2007, Clarke reported poor sleep, hyperactivity even while tired, racing thoughts, and auditory hallucinations. (R. 292). At various times, Clarke requested social work assistance from her case manager, and on January 2, 2008, she reported difficulty for financial reasons in getting medications and supplies for the treatment of her diabetes. (R. 295). She reported that she her limbs were "swollen and tingly." *Id.*

At the time of a new treatment plan on January 30, 2008. Clarke reported depression, anxiety, trouble sleeping, auditory hallucinations, and problems with concentration and memory. (R. 270). Her GAF was reported as 48. (R. 273). On February 28, 2008, Dr. Cates saw Clarke, and she reported that she was sad and frustrated. (R. 298). She had auditory hallucinations telling her to kill herself. *Id.* While babysitting a grandchild, she had thoughts of throwing the baby on the floor, and she had discontinued babysitting because the incident scared her. *Id.* Dr. Cates noted the psychotic symptoms and depressed mood, and he adjusted her medications. *Id.* Dr. Cates saw her again on March 7, 2008. (R. 300).

A Physical Residual Functional Capacity Assessment was completed by Penny Aber on March 22, 2006. (R. 220-27). This assessment showed that Clarke had the exertional ability to perform sedentary work, and the consultant cited extensively to Clarke's treatment records, including noting Clarke's symptoms of diabetic neuropathy with numbness in her fingers and toes. (R. 221-22). For postural limitations, she stated that Clarke could only occasionally stoop, and she found no other limitations. (R. 222-27).

Clarke was examined by agency consultant Angelo Dalessandro, D.O. on March 7, 2007.

(R. 188-95). He reported Clarke's chief complaint as depression, and he also noted that she had auditory and visual hallucinations. (R. 188). He reviewed her past and present symptoms, including her diabetes, her complaints of pain in her shoulders, elbow, and hands, and her numbness in her hands and feet, among other symptoms. (R. 188-89). On examination, Dr. Dalessandro noted that Clarke appeared depressed and had a flat affect. (R. 189). Her gait was normal, she did not have trouble getting on and off the examination table, and she could heel-and-toe walk. (R. 189-90). Dr. Dalessandro noted tenderness in Clarke's elbows with normal range of motion and tenderness in her shoulders with reduced range of motion. *Id.* Straight leg raising was positive. (R. 190). He stated that "sensory, motor, and vibratory sensations are intact." *Id.* His impressions were morbid obesity, hypertension, diabetes mellitus, type 1, with peripheral neuropathy, and osteoarthritis, with notes to rule out psychotic depression and alcohol abuse. *Id.*

Following Dr. Dalessandro's examination and report, a second Physical Residual Functional Capacity Assessment was completed on March 13, 2007, by Thurma Fiegel, M.D., an agency non-examining consultant. (R. 196-203). Dr. Fiegel found that Clarke's exertional RFC would allow her to perform light work, and in her explanation Dr. Fiegel noted Clarke's morbid obesity, diabetes, and hypertension, but cited her normal gait, good use of hands, 50-degree flexion of the lumbar spine, as well as no motor or sensory loss. (R. 197). For postural limitations, Dr. Fiegel found that Clarke could only occasionally stoop. (R. 198). Dr. Fiegel found no manipulative limitations, but did find that Clarke had limited visual acuity. (R. 199). She found no other limitations. (R. 200-03).

Non-examining agency consultant Burnard Pearce completed a Psychiatric Review Technique Form on March 20, 2006, finding that Clarke's mental impairments were not severe.

(R. 206-19).   For the "Paragraph B Criteria,"[2] Pearce found that Clarke had only mild limitations of her activities of daily living, social functional, and concentration, persistence or pace, and he did not mark a box regarding episodes of decompensation.  (R. 216).

Dr. Sadaf Hussain, one of Clarke's treating physicians at Morton, completed a type-written form entitled "Physical Exertion Limitations" on September 7, 2007.  (R. 251).  On this form, Dr. Hussain checked a box indicating that Clarke could perform less than sedentary work and indicated that this was because Clarke would have problems lifting, sitting, and carrying. *Id.*  He wrote in that she had pain in extremities and neuropathy.  *Id.*  Dr. Hussain also completed a form entitled "Physician's Assessment (Diabetes)."  (R. 252).  He said diabetes had been diagnosed beginning in September 2006, but he checked "no" on questions regarding neuropathy,[3] acidosis, and amputation.  *Id.*  In an area for other impaired organ systems, Dr. Hussain wrote in hypertension and "neuropathy at times in legs."  *Id.*

Dr. Cates, Clarke's treating psychiatrist at Family and Children's Services, and Crystal Brill, B.S., CM-A, completed a type-written form entitled "Medical Assessment of Ability to Do Work-Related Activities (Mental)" on June 12, 2007.  (R. 248-50).  Dr. Cates checked boxes for "fair" or "poor/none" for all of the categories included on the form, such as ability to understand

---

[2]   There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C.  *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

[3]   The question regarding neuropathy was very detailed and included a requirement that the neuropathy resulted "in sustained disturbance of gross and dexterous movements, or gait and station."  (R. 252).

8

and carry out job instructions, ability to function independently, and ability to maintain attention and concentration. *Id.*  No narrative explanations or elaborations were included on the form.  *Id.*

## Procedural History

On September 27, 2005, Clarke filed an application for disability insurance benefits under Title II, 42 U.S.C. § 401 *et seq.*  (R. 70-72).  In this application, Clarke alleged disability beginning April 1, 2004.  *Id.*  Clarke's application for benefits was denied in its entirety initially and on reconsideration. (R. 65-69).  A hearing before ALJ Deborah L. Rose was held May 2, 2008, in Tulsa, Oklahoma.  (R. 359-79).  By decision dated June 19, 2008, the ALJ found that Clarke was not disabled at any time through the date of the decision.  (R. 14-21).  On November 10, 2008, the Appeals Council denied review of the ALJ's findings.  (R. 5-7).  Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal.  20 C.F.R. § 404.981.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. § 404.1520.[4]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

---

[4] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish

(detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

---

that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

**Decision of the Administrative Law Judge**

The ALJ found that Clarke met insured status through March 31, 2007. (R. 16). At Step One, the ALJ found that Clarke had not engaged in any substantial gainful activity since her alleged onset date of April 1, 2004. *Id.* At Step Two, the ALJ found Clarke had severe impairments of insulin-dependent diabetes mellitus with peripheral neuropathy affecting the legs, hypertension, major depressive disorder with psychotic features, and post-traumatic stress disorder. *Id.* At Step Three, the ALJ found that Clarke's impairments did not meet any Listing. *Id.*

The ALJ determined that Clarke had the RFC to perform a range of sedentary work that was limited by only occasional stooping, although she found that Clarke could frequently climb, balance, kneel, crouch, and crawl. (R. 18). The ALJ further limited Clarke's RFC by stating that "[m]entally, she is limited to simple and routine tasks that can be learned in 30 days." *Id.* At Step Four, the ALJ found that Clarke could not return to past work. (R. 20). At Step Five, the ALJ found that there were jobs in the economy that Clarke could perform with her RFC. (R. 21). Therefore, the ALJ found that Clarke was not disabled at any time through the date of her decision. (R. 21).

**Review**

On appeal, Clarke asserts errors relating to Listing 12.04 at Step Three, the ALJ's analysis of treating physician opinion evidence, the ALJ's credibility assessment, and the ALJ's RFC determination. The Court agrees that the ALJ's credibility assessment is not in keeping with legal requirements, and therefore the ALJ's decision is reversed. Because reversal is required due to the credibility issue, the other issues raised by Clarke are not discussed.

Credibility determinations by the trier of fact are given great deference. *Hamilton v.*

*Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart*, 287 F.3d 903, 910 (10th Cir. 2001). In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

> While a claimant's credibility is generally an issue reserved to the ALJ, the issue is reviewable to ensure that the underlying factual findings are "closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."

*Swanson v. Barnhart*, 190 Fed. Appx. 655, 656 (10th Cir. 2006) (unpublished), *quoting Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) (further quotations omitted).

Here, the ALJ's credibility assessment does not comply with the requirement that she give specific reasons that were linked to the evidence. On page 6 of her decision, the ALJ includes the standard paragraph that Clarke's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that Clarke's statements were not credible to the extent they were inconsistent with the RFC "for the reasons explained below." (R. 19).

The ALJ's next sentence states that Clarke's "alleged diabetic neuropathy is not well documented." *Id.* She then noted that Dr. Hussain, one of the physicians at Morton who treated Clarke, described the neuropathy as only occurring "at times" in Clarke's legs. *Id.* While the undersigned is mindful of the deferential standard governing this review of the ALJ's credibility assessment, the undersigned nevertheless finds that the ALJ's conclusion that the neuropathy is not well documented to be tenuous. While it is true that Dr. Hussain wrote that Clarke had

neuropathy "at times" in her legs, it is also true that none of the examining or treating physicians appeared to question the diagnosis of neuropathy. The records of Clarke's treatment at Morton indicate that Clarke's diabetes was poorly controlled, and she was given diabetic foot examinations.[5] (R. 161-62, 170-72, 174). On December 27, 2004, the Morton records specifically show a diagnosis of neuropathy, and the physical examination on that date appeared to reveal decreased sensation in Clarke's fingertips. (R. 165-66). Clarke's complaints of numbness were made to a chiropractor, to the doctor treating her at Hillcrest when she had ileitis, and to the doctors at the New Tradition Clinic, and none of these physicians appeared to question Clarke's symptoms of neuropathy. (R. 122, 303-06, 313). Agency consultant Dr. Dalessandro included "[d]iabetes mellitus, type 1, with peripheral neuropathy" in his impressions when he examined Clarke. (R. 190). The first non-examining agency consultant, who found Clarke's exertional limitations to be consistent with sedentary work, appeared to accept that Clarke had diabetic neuropathy. (R. 222). In the face of this medical evidence, the ALJ's conclusion that Clarke's neuropathy was not well established is lacking the required support of substantial evidence. Further, even if the Court agreed with the ALJ's conclusion that there was a failure of objective medical evidence substantiating Clarke's complaints regarding neuropathy, the Tenth Circuit has stated that lack of objective evidence substantiating subjective complaints standing alone is an insufficient basis for a credibility assessment. *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004), *citing* 20 C.F.R. § 404.1529(c)(2).

---

[5]   In the definition of "diabetic polyneuropathy," Taber's Cyclopedic Medical Encyclopedia states that it is "[t]he most common disabling chronic complication of diabetes mellitus, affecting up to 50% of patients [with diabetes]. . . . Clinically, neuropathic ulcers may develop, [especially] on the feet. Thus, patients should be instructed to examine their feet daily . . . ." Taber's Cyclopedic Medical Dictionary 1555 (17th ed. 1993).

The next sentence in the ALJ's decision does not appear to relate to credibility at all. The ALJ states that Clarke's testimony was that her husband did all of the housework. (R. 19). The undersigned is not sure how this testimony undermines Clarke's credibility, and the ALJ provided no explanation linking it to credibility. Without any explanation, this one sentence does not meet the requirement that a credibility assessment consist of specific reasons closely linked to substantial evidence. *Kepler*, 68 F.3d at 391.

Next, the ALJ summarizes the April 15, 2008 record of Clarke's electric stimulation therapy at New Tradition Clinic, when Clarke rated her pain as a "1" after the therapy and said that it felt as though she had new legs and that her arms felt stronger. (R. 19). The ALJ states that "this indicates that [Clarke] elects not to do much physically but that she has the capability of doing more if she so chose." (R. 19). The undersigned disagrees that this one entry undermines Clarke's credibility or that it supports the ALJ's conclusion that she could do more physically if she chose to do so. First, the ALJ does not mention that the cited form states that before the therapy, Clarke had rated her pain as a "7." (R. 306). *Hardman*, 362 F.3d at 681 (improper to "pick and choose among medical reports, using portions of evidence favorable to [ALJ's] position while ignoring other evidence" when assessing credibility). Second, this entry appears to be consistent with Clarke's testimony at the hearing that she had just started a new treatment based on electrical stimulation that helped, but that the pain returned after about 24 hours. (R. 368-69). Especially given Clarke's testimony consistent with it, one entry of a new therapy that gave Clarke relief from her pain was not substantial evidence that undermined Clarke's credibility. *Hayden v. Barnhart*, 374 F.3d 986, 993-94 (10th Cir. 2004) (referenced medical records were not sufficient evidence to support finding of lack of credibility when the records were not inconsistent with the claimant's testimony).

This appears to be the sum total of the ALJ's credibility assessment, because at this point in her decision, the ALJ went on to explain the weight that she gave to the opinion evidence. (R. 19). None of the three lines of reasoning[6] that the ALJ gave met the requirement of specific reasons linked to substantial evidence. *Kepler*, 68 F.3d at 391. The ALJ's decision must be remanded for further proceedings to assess Clarke's credibility.[7] *Hardman*, 362 F.3d at 678-82. Therefore the ALJ's decision is reversed.

## Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 24th day of March 2010.

_____
Paul J. Cleary
United States Magistrate Judge

---

[6] The Commissioner gives additional reasons why the ALJ's credibility assessment was supported, citing to Clarke's testimony, other portions of the medical records, Clarke's application documents, and Clarke's activities of daily living. Defendant's Response Brief, Dkt. #17, p. 8-9. None of these bases were included in the ALJ's decision, however. This Court will not engage in a "*post hoc* effort to salvage" the ALJ's credibility assessment, as the Commissioner appears to desire. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).

[7] Because reversal is required on the point of credibility, Clarke's other contentions on appeal are not addressed. However, the undersigned notes that the Commissioner should review the other issues on remand to ensure that any further proceedings comply with legal requirements and are supported by substantial evidence.